**UNITED STATES of America, Appellee,**

v.

**Charles D. SCANIO,
Defendant–Appellant.**

**No. 172, Docket 89–1153.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 27, 1989.

Decided March 16, 1990.

See also, D.C., 705 F.Supp. 768.

Richard L. Baumgarten, Buffalo, N.Y., for defendant-appellant.

William J. Knapp, Sp. Atty., U.S. Dept. of Justice, (Dennis C. Vacco, U.S. Atty. for the W.D. of New York, Buffalo, N.Y., of counsel), for appellee.

Before OAKES, Chief Judge, PIERCE and RUBIN,* Circuit Judges.

PIERCE, Senior Circuit Judge:

Charles Scanio appeals from a judgment of conviction, after a jury trial, entered in the Western District of New York, Telesca, Chief Judge, of one count of structuring a currency transaction in violation of 31 U.S.C. §§ 5324(3) and 5322(a).[1]

Scanio asserts several grounds for reversal but principally contends that, in order to impose criminal liability for structuring a currency transaction, the government was required to show that he was actually aware that structuring is illegal. Scanio claims his conviction must be reversed due to the absence of evidence that he knew that his conduct was unlawful.

## FACTS

On March 1, 1988, Scanio entered the Brighton branch of Citibank in Rochester, New York, and asked a teller, Tamara Hamilton, the amount owed by him on his line of credit. Hamilton informed him that the balance due was $13,101.17. Hamilton testified that Scanio then wrote this amount on a deposit slip and handed the slip to her together with $13,101.17 in cash.

While the teller was counting the money, she recalled that, under federal law, the bank would be required to file a Currency Transaction Report ("CTR"). According to the teller, when she requested identification, Scanio asked whether this was "for the government form that ha[s] to be filed for over ten thousand dollars?" Upon being informed that it was, Scanio sought to lower the payment to $10,000; when the teller indicated that she thought that even this amount would trigger the filing requirement, Scanio decided to pay only $9,500 of the amount he owed. At trial, Hamilton testified as follows:

Q [by Mr. Knapp, for the government] When he asked you if the information you needed was for the government form, what did you tell him?

A I told him it was.

Q Did he say anything about the government form at that point?

A Yes. He said that he didn't want it to be filed; that he'd lower the amount to ten thousand so it wouldn't have to be filed.

\* \* \*

Q And what did you say at that point?

A That we could—I mean, if that's what he wanted to do, that's what we would do.

Q Did you indicate to him that if he lowered it simply to ten thousand dollars that you understood that you might still have to file a Currency Transaction Report?

A Yes. Because I was still confused as to the limit. . . .

\* \* \*

Q All right. The [other] tellers thought that ten thousand—a ten thousand dollar deposit would require a form, and Mr.

\* The Honorable Alvin B. Rubin, Senior Circuit Judge of the United States Court of Appeals for the Fifth Circuit, sitting by designation.

1. Scanio was sentenced to twelve months imprisonment, twenty-four months of supervised release—conditioned upon his payment of a $5,000 fine and his non-participation in illegal gambling activities—and a $50 special assessment. His sentence was stayed by the district court pending determination of this appeal.

Scanio indicated that he believed a ten thousand dollar deposit would not require a form?

A  Right.

Q  How did this discussion get resolved?

A  Mr. Scanio then in turn just said, "Well, we'll lower it to ninety-five hundred, and then there wouldn't be any confusion as to whether or not ten or above would trigger the filing of the CTR."

The teller changed the deposit slip to indicate a $9,500 deposit and returned the rest of the cash to Scanio. Scanio then indicated his intention to go to another Citibank branch to pay the remaining amount owed, but after further discussion ensued as to whether such a payment would be aggregated with the $9,500 deposit and thus trigger the CTR requirement, he abandoned this idea. *See* 31 C.F.R. § 103.22(a)(1) (1989) (banks required to aggregate multiple currency transactions in single business day). Scanio testified as follows:

A  *  *  *

So I asked her if I had gone to another bank, Citibank branch, if I made the payment, would it be all right. You know, it'd still be a separate transaction from that transaction.

Q  [by Mr. Palmiere, defense counsel] Would it be all right in terms of—

A  Of not making out one of these forms.

Q  You didn't want a form made out?

A  No, I did not. I didn't want to make the form out.

Q  So you asked whether or not you could go to a branch and whether or not that separate branch transaction on the same day would be considered a separate transaction for purposes of this form?

A  Correct.

*  *  *

Q  And what did she say?

A  She huddled with the other [tellers], and she said, "Well, as far as"—they seemed like they didn't know really, really know, but they said that they more or less probably would make out one of these reports.

So I says, "Okay. I'll just come—you know, I'll come tomorrow."

*  *  *

Q  So you told her ... that you would come back tomorrow—

A  Right.

Q  —to pay it off I assume?

A  Yes.

Scanio did, in fact, return to the Brighton branch the next day and did pay the remainder due on his line of credit. At the completion of this payment, Scanio commented to Teller Hamilton that, since the transaction had been consummated over a two-day period, no CTR would be required. Hamilton agreed and, in fact, Citibank did not file a CTR for either the March 1 or the March 2 payment. Thereafter, Scanio was arrested and charged with having structured a currency transaction for the purpose of evading the requirement that the bank file a CTR. For the reasons which follow, we affirm the judgment of conviction.

## DISCUSSION

### I.

Under the Bank Secrecy Act of 1970 (the "Act"), and the regulations promulgated thereunder, financial institutions, including banks, are obligated to report currency transactions in excess of $10,000 to the government. *See* 31 U.S.C. § 5313(a) (1982); 31 C.F.R. § 103.22(a)(1) (1989). Since individuals engaging in sizeable cash transactions often are involved in criminal activity, reports filed pursuant to this requirement assist the government in its efforts to investigate and combat a wide range of criminal conduct. *See* Rusch, *Hue and Cry in the Counting–House: Some Observations on the Bank Secrecy Act,* 37 Cath.U.L.Rev. 465, 469–73 (1988); *see also* H.R.Rep. No. 975, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News 4394, 4396 ("Criminals deal in money—cash or its equivalent. The deposit and withdrawal of large amounts of currency or its equivalent ... under unusual circumstances may betray a criminal activity."). The government's attempts to col-

lect this information have, however, been frustrated by persons who "structure" their currency transactions—*i.e.*, engage in multiple transactions each involving slightly under $10,000 as to avoid triggering the financial institutions' filing obligations.

While the Act itself left open the possibility that any "participant" in a currency transaction could be required to file a CTR, the regulations adopted by the Treasury Department under the Act do not apply to bank customers. However, prior to legislation specifically relating to structured transactions, enacted in 1986 and effective in January 1987, persons engaging in such transactions were prosecuted either for willfully causing a financial institution to fail to file a CTR, *see* 18 U.S.C. § 2(b), for knowingly and willfully concealing a material fact from the government, 18 U.S.C. § 1001, or for conspiracy, 18 U.S.C. § 371. These prosecutions led to a split among the various Circuit Courts of Appeals. Several courts rejected attempts to impose criminal liability either because they concluded that the Act did not provide customers with fair warning that structuring was unlawful or because they believed that there could be no accessory liability since the financial institution was not obligated to aggregate separate currency transactions into one reportable transaction. *See, e.g., United States v. Anzalone,* 766 F.2d 676, 679–83 (1st Cir.1985); *United States v. Larson,* 796 F.2d 244, 246–47 (8th Cir.1986); *United States v. Varbel,* 780 F.2d 758, 762 (9th Cir.1986); *United States v. Denemark,* 779 F.2d 1559, 1563 (11th Cir.1986); *see also United States v. Mastronardo,* 849 F.2d 799, 804–05 (3d Cir.1988) (applying law in effect prior to January 1987); *United States v. Gimbel,* 830 F.2d 621, 624–26 (7th Cir.1987) (same).

By contrast, this court and several others affirmed structuring convictions, at least in cases where the defendant engaged in multiple currency transactions totalling more than $10,000 at a single bank in a single day. *See, e.g., United States v. Heyman,* 794 F.2d 788, 790–93 (2d Cir.), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986); *United States v. Thompson,* 603 F.2d 1200, 1202–04 (5th Cir.1979); *United States v. Tobon–Builes,* 706 F.2d 1092, 1096–1101 (11th Cir.1983); *see also United States v. Nersesian,* 824 F.2d 1294, 1309–15 (2d Cir.) (applying law in effect prior to January 1987), *cert. denied,* 484 U.S. 957, 958, 108 S.Ct. 355, 357, 98 L.Ed.2d 380, 382 (1987), 484 U.S. 1061, 108 S.Ct. 1018, 98 L.Ed.2d 983 (1988); *United States v. American Investors of Pittsburgh, Inc.,* 879 F.2d 1087, 1094–1100 (3d Cir.) (same), *cert. denied,* —— U.S. ——, 110 S.Ct. 368, 107 L.Ed.2d 354 (1989), —— U.S. ——, 110 S.Ct. 721, 107 L.Ed.2d 741 (1990); *United States v. Richeson,* 825 F.2d 17, 19–20 (4th Cir.1987) (same).

In 1986, confronted with conflicting case law regarding prosecutions for structuring transactions, Congress unequivocally sought to enhance the arsenal of prosecutors in their battle against drug traffickers and money launderers by "codify[ing] *Tobon–Builes* and like cases and ... negat[ing] the effect of *Azalone, Varbel* and *Denemark.*" S.Rep. No. 433, 99th Cong., 2d Sess. 22 (1986) [hereinafter *Senate Report*]; *see also* H.R.Rep. No. 746, 99th Cong., 2d Sess. 18–20 (1986) [hereinafter *House Report*]. Thus, as part of the Anti–Drug Abuse Act of 1986, Congress enacted 31 U.S.C. § 5324 which provides that:

> No person shall for the purpose of evading the reporting requirements of section 5313(a) with respect to such transaction—
>
> (1) cause or attempt to cause a domestic financial institution to fail to file a report required under section 5313(a);
>
> (2) cause or attempt to cause a domestic financial institution to file a report required under section 5313(a) that contains a material omission or misstatement of fact; or
>
> (3) *structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.*

31 U.S.C. § 5324 (Supp. V 1987) (emphasis added); *see* 31 C.F.R. § 103.11(n) (1989) (defining "structuring"). Criminal penalties for "willful[ ]" violations of § 5324 are

set out in 31 U.S.C. § 5322(a) (Supp. V 1987).

At the trial, Judge Telesca charged the jury that, in order to convict, it had to determine, beyond a reasonable doubt, (1) that Scanio knew that Citibank was obligated to report certain currency transactions; (2) that he knowingly and willfully structured his currency transaction; and (3) that his purpose in structuring his transaction was to evade § 5313(a)'s reporting requirement. On appeal, Scanio asserts that, since his claim of ignorance of § 5324(3) should have been considered on the question of willfulness, the district judge erred in instructing the jury that the government was not required to show that he actually knew that structuring is unlawful. Our research reveals no reported cases interpreting § 5322(a)'s requirement of willful conduct in the context of a criminal prosecution under § 5324(3), *cf. United States v. 316 Units of Municipal Securities*, 725 F.Supp. 172, 177–79 (S.D.N.Y.1989) (civil forfeiture action; discussing *United States v. Camarena*, No. 88–1314 (5th Cir. Dec. 6, 1988) (unreported opinion), *cert. denied*, —— U.S. ——, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989)), and, thus, we write on a clean slate.

Since the elements of federal crimes are established by Congress, we look to the statutory language and legislative history to determine the mental state that is required to establish criminal liability herein. *See Liparota v. United States*, 471 U.S. 419, 424–25, 105 S.Ct. 2084, 2087–88, 85 L.Ed.2d 434 (1985).

By its plain language, § 5324(3) is violated when an individual structures a currency transaction with the intent to evade § 5313's reporting requirements. While § 5324(3) does not specifically require proof that the defendant know that structuring is unlawful, we must consider whether § 5322(a), which provides criminal penalties for *willful* violations of § 5324,

mandates that there must be proof that the defendant was actually aware of the illegality of structuring.

■ The meaning of the term "willful" depends upon the context in which it is used, *see United States v. Stroud*, 893 F.2d 504, 507 (2d Cir.1990) (quoting *Screws v. United States*, 325 U.S. 91, 101, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945) (plurality opinion)), and a requirement that an act be done "willfully" normally does not necessitate proof that the defendant was specifically aware of the law penalizing his conduct. Where the law imposes criminal liability for certain conduct, a requirement that the conduct be "willful" generally "means no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law." *American Surety Co. v. Sullivan*, 7 F.2d 605, 606 (2d Cir.1925) (L. Hand, J.); *United States v. Gregg*, 612 F.2d 43, 51 (2d Cir.1979) ("It is well settled that ignorance of the law is no defense to purposeful and intentional action." (citing *Lambert v. California*, 355 U.S. 225, 228, 78 S.Ct. 240, 242, 2 L.Ed.2d 228 (1957)).[2]

■ Scanio asserts that in order to establish that his conduct was "willful" the government was required to prove that he actually knew that structuring is unlawful. Indeed, where persons have been charged with willfully transporting more than $10,000 in monetary instruments into or out of the country without having filed Currency and Monetary Instrument Reports, *see* 31 U.S.C. §§ 5316, 5322 (Supp. V 1987), this court has required that the government show both the defendant's actual or probable knowledge of the reporting requirement and the defendant's intention to commit the crime. *United States v. San Juan*, 545 F.2d 314, 318 (2d Cir.1976) (construing prior versions of §§ 5316 and 5322); *accord United States v. Dichne*, 612 F.2d

---

2. We recognize that "the general principle that ignorance or mistake of law is no excuse is usually greatly overstated." *See Model Penal Code* § 2.02 comment 11 at 131 (Tent. Draft No. 4, 1955). However, since we reject appellant's assertion that the government must establish that he specifically knew that structuring is un-

lawful, we similarly reject his claim that ignorance of the provision outlawing structuring negates the *mens rea* required to establish an element of the offense charged. *See* W. LeFave & A. Scott, *Handbook on Criminal Law* § 47, at 365 (1972). *See generally United States v. Golitschek*, 808 F.2d 195, 202–03 (2d Cir.1986).

632, 636 (2d Cir.1979) (same), *cert. denied*, 445 U.S. 928, 100 S.Ct. 1314, 63 L.Ed.2d 760 (1980); *United States v. Granda*, 565 F.2d 922, 925–26 (5th Cir.1978) (same); *see United States v. $359,500 in United States Currency*, 828 F.2d 930, 933 (2d Cir.1987) (" 'Willfully' in § 5322 modifies 'violat[es]', thereby making knowledge of the reporting requirement 'an additional element the government must prove to secure a criminal' conviction.") (quoting *United States v. $122,043.00 in United States Currency*, 792 F.2d 1470, 1474 (9th Cir.1986)); *cf. United States v. Bank of New England*, 821 F.2d 844, 854 (1st Cir.) (knowledge by bank of § 5313(a)'s filing requirement necessary to establish a criminal violation), *cert. denied*, 484 U.S. 943, 108 S.Ct. 328, 98 L.Ed.2d 356 (1987); *United States v. Eisenstein*, 731 F.2d 1540, 1543 (11th Cir. 1984) ("without knowledge of the reporting requirement, a would-be violator cannot be expected to recognize the illegality of his otherwise innocent act").

The requirement that a defendant be actually or probably aware of a reporting obligation before liability may attach for failure to file stems from the view that "[t]he primary purpose of law, and the criminal law in particular, is to conform conduct to the norms expressed in that law. When there is no knowledge of the law's provisions, and no reasonable probability that knowledge might be obtained, no useful end is served by prosecuting the 'violators.' " *United States v. Mancuso*, 420 F.2d 556, 559 (2d Cir.1970). In *Lambert v. California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957), for example, the Supreme Court declared unconstitutional a Los Angeles ordinance which required all convicted felons to register with the police within five days of their arrival in the city. The Court held that due process barred the imposition of criminal liability, absent proof that the defendant knew that she was obligated to register, since the statute punished inaction, unaccompanied by any conduct, and there were no circumstances which would alert the offender of the registration obligation. 355 U.S. at 228–30, 78 S.Ct. at 242–43.

In the present case, however, Scanio was not prosecuted for having failed to comply with an obscure reporting requirement; he was charged with having intentionally structured a currency transaction with the explicit purpose of evading what he knew to be the bank's legal duty to file CTRs for all transactions exceeding $10,000. Scanio engaged in affirmative conduct and demonstrated an awareness of the legal framework relative to currency transactions which, it is reasonable to conclude, should have alerted him to the consequences of his conduct. *See, e.g., United States v. International Minerals & Chemical Corp.*, 402 U.S. 558, 564–65, 91 S.Ct. 1697, 1701–02, 29 L.Ed.2d 178 (1971) (presumption of knowledge of regulations drawn from the probability that dangerous, as opposed to innocuous, materials will be regulated); *United States v. Fierros*, 692 F.2d 1291, 1295 (9th Cir.) (actual knowledge of statute is not required where provision is not complex and where regulation of the acts made criminal is highly likely), *cert. denied*, 462 U.S. 1120, 103 S.Ct. 3090, 77 L.Ed.2d 1350 (1983); *cf. Lambert*, 355 U.S. at 229, 78 S.Ct. at 243 (due process may be satisfied where circumstances provide notice of an otherwise obscure registration requirement).

Judge Telesca's charge encompassed both of these elements: in substance, he informed the jury that, in order to convict, it had to find that Scanio *knew* he was acting in a highly regulated area and that he *intended* to deprive the government of information to which it was entitled. We believe the charge accurately reflected the elements that had to be proved in order to establish a criminal violation of § 5324(3), and we are not persuaded that use of the term "willful" in § 5322(a) required proof that Scanio knew that structuring is unlawful.

To the extent our present interpretation of § 5322(a) seems inconsistent with our interpretation of the same provision in the context of a prosecution for failure to file Currency and Monetary Instrument Reports required under § 5316, *see, e.g., San Juan*, 545 F.2d at 318–19 (necessitating proof that defendant knew, or should have

known, of the law he is alleged to have violated), we reiterate that, unlike § 5316 which requires individuals to report otherwise innocent transactions, § 5324(3) prohibits purposeful conduct aimed at defeating the government's right to information. Where a defendant is charged with violating an obscure reporting provision, proof that (s)he was specifically aware of the reporting provision is necessary to establish criminal intent. With respect to a prosecution for structuring, however, the requirement that a defendant be shown to have acted with a "bad purpose" is satisfied by proof that (s)he (1) knew that the bank was legally obligated to report currency transactions exceeding $10,000 and (2) intended to deprive the government of information to which it is entitled.

Our view that a criminal violation of § 5324(3) may be established without proof that the defendant knew that structuring is unlawful effectuates Congress's clear intent as is shown by the legislative history surrounding the anti-structuring provision. As we note above, § 5324 was enacted in 1986 to close a loophole in the Bank Secrecy Act of 1970 which enabled structuring, or "smurfing," rings to launder large amounts of ill-gotten currency by engaging in multiple currency transactions, each under $10,000, within a brief period of time. *See supra* at 488; *cf. House Report* at 19–20 (describing operation of one "smurfing" ring). *See generally The Drug Money Seizure Act and the Bank Secrecy Act Amendments: Hearing on S. 571 and S. 2306 Before the Senate Committee on Banking, Housing, and Urban Affairs,* 99th Cong., 2d Sess. (1986) [hereinafter *Senate Hearings* ]. With respect to the applicable *mens rea,* the legislative history indicates that Congress only intended to require proof that the defendant structured a currency transaction in order to prevent the financial institution from filing a CTR. Thus, the Senate Report states that the anti-structuring provision applies to "a person who converts $18,000 in currency to cashier's checks by purchasing two $9,000 cashier's checks ... on two different days *with the specific intent that the participating bank or banks not be required to*

*file [CTRs]...." Senate Report,* at 22 (emphasis added).

The legislative history provides additional indications that Congress sought to protect unwary bank customers by requiring proof that they knew of, and intended to evade, the reporting provision—rather than by requiring proof that they knew that structuring is unlawful. For example, in response to written questions from Senator D'Amato, the Justice Department stated that individuals who inadvertently divide a currency transaction in excess of $10,000 into smaller transactions would not be subject to structuring liability since the bill "requires proof beyond a reasonable doubt that the purpose of the 'structured' aspect of a currency exchange was to evade the reporting requirements of the Bank Secrecy Act. It is this requirement which shields innocent conduct from prosecution." *Senate Hearings* at 136–37; *see also House Report* at 68–69 (supplemental views of Reps. McCandless, Dreier, Shumway, and Kolbe) (objecting to prior version of anti-structuring provision which imposed strict liability and suggesting need for addition of an "intent to evade" requirement); *cf. United States v. Thakkar,* 721 F.Supp. 1030, 1033–34 (S.D.Ind.1989) (discussing scienter requirement in response to vagueness challenge). In light of this legislative history, we decline Scanio's invitation that we impose, as an additional constraint upon the use of § 5324(3), the requirement that the government prove that the defendant had actual knowledge that structuring is unlawful.

Finally, we decline to ascribe undue significance to the fact that the Treasury Department proposed, but ultimately did not adopt, regulations aimed at publicizing the anti-structuring provision. *See* 53 Fed. Reg. 7,948 (1988) (proposing amendment to regulations); 54 Fed.Reg. 20,398 (1989) (withdrawing proposed amendment). While increased awareness of the anti-structuring provision would, in all likelihood, lead to increased compliance with § 5313(a), the mere fact that the Treasury Department considered ways of publicizing § 5324(3) does not compel the conclusion

that such publication is required in order to impose criminal liability.

## II.

■ Scanio next argues that the district court erred in refusing to charge the terms of 31 C.F.R. § 103.22(a) to the jury. At the time of the events at issue herein, that regulation provided, in relevant part:

> Each financial institution ... shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000. Multiple currency transactions shall be treated as a single transaction if the financial institution has knowledge that they are by or on behalf of any person and result in either cash in or cash out totalling more than $10,000 during any one business day.

31 C.F.R. § 103.22(a)(1) (1989).

At trial, the parties stipulated that, as a domestic financial institution, Citibank was required to report Scanio's currency transactions which exceeded $10,000. During the charging conference, however, Scanio argued that he was entitled to have the jury instructed that, under the regulation, the bank was obligated to aggregate multiple currency transactions exceeding $10,-000 during any one business day. Scanio requested this instruction in support of his claim that he held a good faith belief that the bank could accept a structured transaction covering more than one business day without being required to file a CTR.

We see no error in the trial court's decision not to charge the exact terms of § 103.22(a). Scanio was charged with structuring a currency transaction "for the purpose of evading the currency reporting requirements of 31 U.S.C. § 5313(a) and 31 C.F.R. § 103.22(a)" and not with violating the regulation. The regulation was not an element of the crime charged and was only relevant to the extent it explained the reporting obligation which the government claimed Scanio intended to evade. We believe that the charge, read as a whole, adequately explained this reporting re-

quirement and, therefore, that the district court did not err in refusing to charge the details of the regulation regarding the bank's obligation to aggregate transactions within a single business day.

Moreover, we reject as unpersuasive Scanio's argument that the regulation showed that he did not intend to evade the reporting requirement. In essence, Scanio claims that he cannot be convicted of having structured a currency transaction for the purpose of evading the bank's reporting obligation since Citibank was not obligated to report the transaction as he had structured it, *i.e.*, over a two-day period rather than within a single day. However, whether Scanio successfully evaded the bank's reporting requirement is irrelevant to the question of whether he had the necessary *mens rea* to establish a structuring offense.

## III.

■ Finally, Scanio complains that on cross-examination the prosecutor confronted him with Teller Hamilton's testimony and asked him to characterize it as either incorrect, untruthful, or mistaken. Relying upon *United States v. Richter*, 826 F.2d 206 (2d Cir.1987), Scanio asserts that this cross-examination constituted reversible error.

In *Richter*, the prosecutor confronted the defendant, on cross-examination, with discrepancies between his testimony and that of an FBI agent who had testified during the government's case-in-chief. The defendant was asked whether the agent either had been mistaken or had lied during his testimony. When the defendant asserted that the agent's testimony was false, the prosecution called a second agent to corroborate the first agent's testimony. In his summation, the prosecutor focused on the discrepancies between the agents' testimony and the testimony of the defendant. Additionally, in drawing the jury's attention to the defendant's characterization of the first agent's testimony, the prosecutor did not accurately quote the defendant's testimony.

---

On appeal, this court reversed the conviction. While we noted that the cross-examination had been improper since credibility determinations are to be left to the jury, we expressly stated that our reversal of the conviction was not based upon the improper cross alone. *Id.* at 208. Rather, since the defendant had been given the option of asserting that the first agent had merely been mistaken, and since there was no timely objection, we focused on the use of the corroborative testimony and the prosecutor's improper summation.

Under *Richter*, the government's attempt to compel Scanio to comment on Hamilton's veracity was improper; however, we believe any error was harmless. While the rule barring this type of cross-examination is not limited to situations where the defendant is asked to comment on the testimony of government agents, *see, e.g., People v. Montgomery*, 103 A.D.2d 622, 481 N.Y.S.2d 532, 532 (4th Dep't 1984) (per curiam) (condemning "prosecutorial cross-examination which compels a defendant to state that the police *or other witnesses* lied in their testimony") (emphasis added), we have shown special concern with prosecutors utilizing what some persons perceive as the heightened credibility of government agents (or certain other witnesses) by telling juries "that, if the defendant is innocent, government agents must be lying," *Richter*, 826 F.2d at 209–10 (citing cases).

*Richter* is also distinguishable in that the prosecutor here did not highlight the improper cross-examination in summation. *See Richter*, 826 F.2d at 208–09; *United States v. Kiszewski*, 877 F.2d 210, 217 (2d Cir.1989). *But see United States v. Durrani*, 835 F.2d 410, 424 (2d Cir.1987) (suggesting that improper cross, rather than comments during summation, was most important aspect of *Richter*). Moreover, the prosecutor did not ask Scanio to label Teller Hamilton a liar, but merely asked whether various parts of Hamilton's testimony were either correct or mistaken and whether Scanio agreed with that testimony.

Finally, the cross-examination at issue herein dealt with two issues: whether Scanio had intended to pay more than $10,000 when he went to the bank and whether Scanio had previously engaged in transactions of $10,000 exactly. We see no prejudice from the latter, irrelevant, line of questioning. While the former examination, to which no objection was made at trial, involved a central issue in the case, the record reveals overwhelming evidence that Scanio did, in fact, intend to pay the amount due on his line of credit even if such payment would involve a currency transaction in excess of $10,000.

In his opening statement, Scanio's counsel conceded that Scanio went to the bank on March 1, 1988 to pay the amount due on his line of credit and, in his direct testimony, Scanio acknowledged that, on March 1, 1988, he had gone to the bank with approximately $18,000 which was "going to be used to pay off [his] indebtedness in excess of ten thousand dollars." While Scanio testified that Teller Hamilton might have filled in the deposit slip to indicate a payment in excess of $13,000, he conceded on cross-examination that it looked as though both the initial amount of the deposit and the rest of the slip were written by the same person and it was undisputed that Scanio had filled out the remainder of the form.

The judgment of conviction is affirmed; the mandate shall issue forthwith.