Michael PECK, Petitioner–Appellant,

v.

UNITED STATES of America,
Respondent–Appellee.

No. 1021, Docket 94–2444.

United States Court of Appeals,
Second Circuit.

Argued March 8, 1995.

Decided Dec. 28, 1995.

Jeremiah Donovan, Old Saybrook, Connecticut, for Petitioner–Appellant.

Andrew P. Gaillard, Assistant United States Attorney for the District of Connecticut, Bridgeport, Connecticut (Christopher F. Droney, United States Attorney, New Haven, Connecticut, of counsel), for Respondent–Appellee.

Before: MAHONEY, WALKER, and CALABRESI, Circuit Judges.

MAHONEY, Circuit Judge:

Petitioner-appellant Michael Peck appeals from a judgment entered June 2, 1994 in the United States District Court for the District of Connecticut, Alan H. Nevas, *Judge,* that granted in part and denied in part Peck's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255.[1] Peck had been convicted, following a jury trial, of two counts of structuring cash transactions to evade bank reporting requirements in violation of 31 U.S.C. §§ 5324(3), 5313(a), and 5322(a).[2] In his petition, he contends that the conviction should be vacated because, in light of the Supreme Court's decision in *Ratzlaf v. United States,* — U.S. —, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), decided after his judgment of conviction was entered, the jury was erroneously instructed with respect to the scienter required for conviction.

Peck did not pursue a direct appeal. Nonetheless, because he has demonstrated cause for his failure to take a direct appeal and actual prejudice resulting from the jury instruction, we reverse the judgment of the district court and vacate Peck's structuring convictions.

## Background

At all relevant times, Peck was an attorney practicing in Hartford, Connecticut. In July 1991, a grand jury indicted Peck on three counts of tax evasion for the years 1984 though 1986 and one count of wilful failure to file a tax return in 1987. The indictment charged that Peck had evaded more than $225,000 in taxes.

Peck was arraigned on these charges on August 1, 1991, and thereafter released on bond. Between then and the time of his trial on the tax charges in July 1992, which resulted in his conviction on all counts and a sentence of eighteen months imprisonment, Peck engaged in a series of transactions that formed the basis of the structuring convictions to which this petition pertains. Specifically, between November 7, 1991 and November 27, 1991, Peck made twelve separate cash deposits each in the amount of $7,500 and two cash deposits each in the amount of $5,000 into an account maintained by his father at the Society for Savings. He made three of the deposits on November 7, each at a separate branch. He also attempted to make a fourth deposit on that day at yet another branch, but declined to do so when he was informed that the bank would have to file a Currency Transaction Report ("CTR").[3]

---

1. In addition to his unsuccessful effort to overturn his prior convictions, Peck sought, and partially obtained, sentencing relief. Because Peck has since concluded his term of imprisonment, no sentencing issue is presented on this appeal.

2. All statutory and regulatory references are to the provisions in effect during the 1991 and 1992 events that underlie the convictions from which Peck seeks relief on this appeal.

3. Financial institutions are required to file CTRs by statute and regulation. 31 U.S.C. § 5313(a) provides in pertinent part:

When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency ..., in an amount, denomination, or amount and denomination, or under circumstances the Secretary [of the Treasury] prescribes by regulation, the institution ... shall file a report on the transaction at the time and in the way the Secretary prescribes.

(The Society filed CTRs with respect to the second and third deposits in any event.) He made the remaining deposits at branches of the institution on separate days throughout the month.

In addition, on March 27, 1992, Peck opened a new checking account at the Northeast Savings Bank, where he had never banked previously, by depositing a $50,000 check from a former law associate. On March 30, Peck withdrew $6,500 by cashing a "starter check," one of the initial series of checks that he received when opening the account. On March 31, he withdrew by starter check $6,000, on April 1, $6,000, and on April 2, $6,500. The bank filed CTRs concerning these withdrawals.

On April 3, Peck attempted to withdraw an additional $6,000 from his Northeast Savings account; withdrew $7,000 from an account that he maintained at the Bank of Boston by writing a counter check; and sought to withdraw $6,000, but withdrew $2,000, from an account he maintained at the Society for Savings (separate from his father's account). On April 6, he attempted to withdraw $5,000 from the Bank of Boston account, but declined to do so when informed that a CTR would be filed due to his April 3 withdrawal. Instead, he withdrew $5,000 from his Society for Savings account.

Peck was then arrested and charged in a two-count indictment with structuring cash transactions in violation of 31 U.S.C. §§ 5324(3), 5313(a), and 5322(a), and 31 C.F.R. §§ 103.22 and 103.53; the two counts relate to the November transactions and the March—April transactions, respectively.[4]

At Peck's trial, the government introduced evidence of the foregoing, and to establish that Peck was aware of the institutions' cash reporting requirements. In the latter regard, evidence demonstrated that cash deposits that Peck had made for himself or his clients had resulted in the filing of numerous CTRs over several years. Moreover, one bank teller recalled explaining the CTR requirement to Peck when Peck engaged in a cash transaction in excess of $10,000 in 1990.

Peck testified in his defense that he believed that the bank reporting requirements applied to transactions of less than $10,000, and therefore thought that the banks were filing CTRs for the transactions supporting his indictment. At the conclusion of Peck's direct examination, the following exchange occurred:

Q. . . . Did you ever intend to structure your banking transactions in order to

---

31 C.F.R. § 103.22(a)(1) implements this statute, and provides in pertinent part:

Each financial institution . . . shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000. Multiple currency transactions shall be rated as a single transaction if the financial institution has knowledge that they are by or on behalf of any person and result in either cash in or cash out totalling more than $10,000 during any one business day.

4. Section 5324 provides in pertinent part:

No person shall for the purpose of evading the reporting requirements of section 5313(a) . . . with respect to such transaction—

. . . .

(3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

The implementing regulatory definition of "structure" is stated in 31 C.F.R. § 103.11(p), which provides:

*Structure (structuring).* For purposes of section 103.53 [which prohibits structuring], a person structures a transaction if that person, acting alone, or in conjunction with, or on behalf of, other persons, conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the reporting requirements under section 103.22 of this part. "In any manner" includes, but is not limited to, the breaking down of a single sum of currency exceeding $10,000 into smaller sums, including sums at or below $10,000, or the conduct of a transaction, or series of currency transactions, including transactions at or below $10,000. The transaction or transactions need not exceed the $10,000 reporting threshold at any single financial institution on any single day in order to constitute structuring within the meaning of this definition.

Criminal penalties are provided in 31 U.S.C. § 5322(a): "A person willfully violating this subchapter or a regulation prescribed under this subchapter . . . shall be fined not more than $250,000, or imprison[ed for] not more than five years, or both."

evade the requirements of these currency transaction reports?

A. No, I had no idea that there was ever such a thing as structuring, absolutely no awareness that there was a, such a criminal charge in my life.

Peck denied engaging in these transactions for the purpose of hiding assets from the Internal Revenue Service, although he admitted that he transferred his interest in his house to his wife and encumbered it with large mortgages to his father and sister in 1991. He claimed that these actions related principally to a civil lawsuit pending against him, although he admitted that he was motivated in part by his tax difficulties.

Peck also sought to explain the reasons for the cash transactions. With respect to the $100,000 deposited to his father's account at the Society for Savings in November 1991, Peck claimed that he was repaying a loan that his father had made to him when he was unable to pay money owed to a law firm that was entitled to share a fee. However, as he conceded, there were no records of this loan, and his father had written a check to him for $100,000 dated November 12, 1991 and posted as paid on November 19, 1991—after more than half of Peck's cash had been deposited at the Society for Savings in purported repayment of the $100,000. Peck claimed that he did not need to deposit the check until the money he owed was due, and that he began repaying the debt at his earliest convenience.

Peck also explained that the three cash transactions that he made on November 7 were coincidental to his other errands; each time, he went home to pick up cash and would deposit the cash at a branch near wherever he had to be for other reasons. He claimed that he declined to make the fourth transaction on that day after being told that a CTR would be filed because he was in too much of a hurry. This was also the explanation for his refusal to engage in another transaction after being informed that a CTR would have to be filed.

With respect to the March and April 1992 transactions, Peck testified that he opened the new account at Northeast Savings Bank, the bank on which the $50,000 check that he deposited was drawn, because the payor's account had insufficient funds to cover the $50,000 check on that day, and Peck believed that it would facilitate matters to deposit the check at the same bank. He explained that he withdrew the money in increments to save time, since withdrawing larger amounts would require the tellers to obtain authorization from their supervisors.

In addition, Peck testified that he found cash transactions in large denominations more convenient than utilizing checks, and that for years he had paid most of his expenses, including salaries, alimony, tuition, and his mortgage, in cash, partly due to a distrust of banks. He also testified that, having been robbed in the past, he carried no more than $7,500 in cash for reasons of safety.

Peck also explained the circumstances of his conviction for income tax evasion, and conceded that on both a loan application and a (bogus, never filed) tax return that he had provided to a bank, he had depicted his income as enormously higher than he had reported it on the tax returns that he actually filed with the Internal Revenue Service. Finally, Peck testified that he had not practiced banking law, handled a federal case, or provided advice regarding federal taxation.

Over Peck's objection, the district court charged the jury with respect to intent and willfulness as follows:

> In order to prove that the defendant had the intent to evade the reporting requirements, the government must prove beyond a reasonable doubt that the defendant knew of the existence of those reporting requirements[,] [s]ince a person cannot have a specific intent to evade a requirement which he knows nothing about[.] [T]hus in order to find the defendant guilty you must find that the government has proved beyond a reasonable doubt, first, that the defendant knew of the reporting requirements of Section 5313(a), and second, that he acted for the specific purpose of evading those reporting requirements.
>
> . . . .
>
> The word willfully has been used so let me try and define that for you. An act or

a failure to act is willfully done if done voluntarily and intentionally and with the specific intent to do something that the law forbids or with a specific intent to fail to do something that the law requires to be done. That is to say, with bad purpose, either to disobey or to disregard the law.

With respect to the offenses charged in this case, the requirement that the defendant acted with a bad purpose is satisfied by proof that he knew that the bank was legally obligated to report currency transactions exceeding $10,000 and that he intended to deprive the government of information to which it is entitled. The defendant's conduct is not willful if you find that he acted because of negligence, inadvertence, accident or due to his good faith misunderstanding of the requirements of the law.

The court declined to charge that the government must prove that Peck knew that structuring was a crime, as Peck requested, because this court had twice upheld the intent instruction as it was charged. *See United States v. Caming,* 968 F.2d 232, 238–41 (2d Cir.), *cert. denied,* 506 U.S. 956, 113 S.Ct. 416, 121 L.Ed.2d 339 (1992); *United States v. Scanio,* 900 F.2d 485, 487–92 (2d Cir.1990).

The jury rendered a verdict of guilty on January 12, 1993, and the district court sentenced Peck to a prison term of twenty-four months, to be served concurrently with his sentence relating to the convictions for tax violations, on February 26, 1993. Judgment was entered on that day, and Peck did not appeal.

On April 26, 1993, the United States Supreme Court granted the petition for a writ of certiorari in *Ratzlaf v. United States,* 507 U.S. 1050, 113 S.Ct. 1942, 123 L.Ed.2d 648 (1993), and on January 11, 1994, the Court held that the word "willfully" in 31 U.S.C. § 5322(a) requires that the government prove in a prosecution for structuring cash transactions that the defendant knew that structuring is unlawful. *Ratzlaf v. United States,* —— U.S. ——, 114 S.Ct. 655, 663, 126 L.Ed.2d 615 (1994).

On April 15, 1994, Peck filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255, claiming that his conviction should be vacated in light of *Ratzlaf.* The district court denied the petition on the ground that because Peck testified in his own defense and the jury rejected his testimony, and because Peck is a lawyer to whom the jury would have attributed the knowledge that structuring is illegal, Peck would have been convicted even if the jury had been charged in accordance with *Ratzlaf,* and thus no "fundamental unfairness" had occurred in convicting him of illegal structuring.

This appeal followed.[5]

## Discussion

As a preliminary matter, we reject the government's argument that habeas relief is not available because *Ratzlaf* may not be applied retroactively. While we have cautioned that habeas relief "is available under section 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law that constitutes ' "a fundamental defect which inherently results in a complete miscarriage of justice," ' " *Hardy v. United States,* 878 F.2d 94, 97 (2d Cir.1989) (quoting *United States v. Addonizio,* 442 U.S. 178, 185, 99 S.Ct. 2235, 2240, 60 L.Ed.2d 805 (1979) (quoting *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962))), a change in the law that results in a conviction "for conduct that is not illegal ... [is] a matter of fundamental importance." *Ianniello v. United States,* 10 F.3d 59, 63 (2d Cir.1993). Thus, when a case "redefine[s] the substance of a ... violation ... [and] place[s] conduct beyond the reach of punishment," collateral review is available. *Id.; cf. United States v. Loschiavo,* 531 F.2d 659, 666 (2d Cir.1976) (noting "due process consider-

---

**5.** Peck has completed his prison term since his petition was denied, *see supra* note 1, and is presently serving a three-year term of supervised release. Although he is no longer in prison, a term of supervised release, which carries with it the possibility of revocation and additional jail time, satisfies the "in custody" requirement of § 2255. *See Jones v. Cunningham,* 371 U.S. 236, 240–43, 83 S.Ct. 373, 375–77, 9 L.Ed.2d 285 (1963) (parole); *cf. Scanio v. United States,* 37 F.3d 858, 860 (2d Cir.1994) (holding that upon expiration of period of supervised release, habeas petitioner was no longer "in custody").

ations" involved in "keeping [petitioner] branded with the conviction and prison sentence for a federal offense, in spite of [an intervening decision's] declaration that he was convicted for a non-existent federal offense").

■ Nevertheless, Peck did not pursue his contention of instructional error on direct appeal. Therefore, in order to obtain habeas relief, Peck must demonstrate cause excusing his failure to do so and actual prejudice resulting from the error. *See United States v. Frady,* 456 U.S. 152, 167–68, 102 S.Ct. 1584, 1594, 71 L.Ed.2d 816 (1982); *Campino v. United States,* 968 F.2d 187, 190 (2d Cir. 1992).[6] We address these requirements in turn.

### A.  *Cause.*

At the time that Peck's conviction was entered on February 26, 1993, this court had issued two opinions rejecting the argument that to prove a "willful[ ]" violation as required by § 5322(a), *see supra* note 4, the prosecution must prove that the defendant knew that structuring is illegal. In the first, we extensively reviewed the history of the statute to ascertain Congress' intended meaning of the word "willfully" in § 5322(a). *Scanio,* 900 F.2d at 487–92. We concluded that because a defendant in a § 5322(a) prosecution is "not prosecuted for having failed to comply with an obscure reporting requirement . . . [, but is] charged with having intentionally structured a currency transaction with the explicit purpose of evading what he knew to be the bank's legal duty to file CTRs for all transactions exceeding $10,000," *id.* at 490, "[o]ur view that a criminal violation of § 5324(3) may be established without proof that the defendant knew that structuring is

unlawful effectuates Congress's clear intent as is shown by the legislative history surrounding the anti-structuring provision." *Id.* at 491.

Two years later, we reaffirmed that holding, describing *Scanio* as "a detailed opinion that carefully and convincingly addressed the issue," *Caming,* 968 F.2d at 239, and noting that "at least four other circuits have agreed with and followed that decision." *Id.* (collecting cases). We also thoroughly considered and rejected the argument that an intervening Supreme Court decision, *Cheek v. United States,* 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), had undermined our holding in *Scanio. Caming,* 968 F.2d at 240–41.

Accordingly, it is clear that a request that we reconsider *Scanio* and *Caming* would have been frivolous; Peck's counsel appropriately elected to forgo wasting the time and resources of this court by appealing on the instructional issue. The government points out, however, that after Peck was convicted, but well before he was sentenced, the First Circuit ruled in banc that the plain meaning of "willfully" in § 5322(a), as well as the structure of the statute, established that "an unintentional, nonreckless mistake of law is a complete defense to a structuring charge." *United States v. Aversa,* 984 F.2d 493, 500 (1st Cir.1993) (in banc), *vacated for further consideration in light of Ratzlaf, sub nom. Donovan v. United States,* 114 S.Ct. 873, 127 L.Ed.2d 70 (1994). The government contends that Peck should have brought this contrary authority to our attention via a direct appeal.

We disagree. While a defendant may bring contrary authority from other circuits to our attention, either in the hope that we will reconsider our position or simply as a

---

**6.** Neither *Frady* nor *Campino* precisely addresses the unusual situation presented on this appeal—a contemporaneous objection at trial followed by a complete failure to appeal. In *Frady,* the petitioner defaulted in both respects. *See* 456 U.S. at 168, 102 S.Ct. at 1594 (Frady must show " 'cause' excusing his double procedural default"). In *Campino,* the defendant made a suppression motion to the district court, but did not raise the suppression issue on direct appeal. *See* 968 F.2d at 189. *A fortiori,* however, if a petitioner must show cause for not having raised an issue on direct appeal, he surely must show

cause for forgoing appeal altogether. *Cf. Murray v. Carrier,* 477 U.S. 478, 493, 106 S.Ct. 2639, 2648, 91 L.Ed.2d 397 (1986) (in determining cause, declining to assess "the nature and strength of the state procedural rule that has not been observed"). In any event, "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Id.* at 496, 106 S.Ct. at 2649.

necessary intermediate step to seeking review by the Supreme Court, once this court has definitively ruled upon an issue, subsequent appeals are not required to preserve habeas relief. *See, e.g., Ingber v. Enzor*, 841 F.2d 450, 454–55 (2d Cir.1988); *Loschiavo*, 531 F.2d at 665–67; *United States v. Liguori*, 438 F.2d 663, 665 (2d Cir.1971).

The government also invokes *Napoli v. United States*, 32 F.3d 31 (2d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995), *rehearing granted, factual inaccuracies corrected, and original determination confirmed*, 45 F.3d 680 (2d Cir. 1995). In that case, the petitioners sought to have their RICO convictions vacated on the ground that the Supreme Court's intervening decision in *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), had rendered the jury charge (which was consistent with Second Circuit precedent) erroneous. We held that the petitioners could not demonstrate cause for failing to raise the issue on appeal. However, the Supreme Court had granted *certiorari* in *Reves* over two months prior to the argument of the defendants' appeal before this court in *Napoli*, and we based our ruling largely upon that fact. *See Napoli* 32 F.3d at 37 (petitioners "could have brought to this Court's attention [on direct appeal] that other circuits disagreed with our analysis ... and that the Supreme Court had granted certiorari in *Reves* to resolve the split among the circuits").

We believe it appropriate to establish a bright line rule that will not "encourage appeal[s] of ... well-settled points of law." *Ingber*, 841 F.2d at 454. The rule that emerges from our prior decisions, and that we adopt today, is that a § 2255 habeas petition will not be denied for lack of cause to excuse a failure to pursue a direct appeal if this court has previously resolved the disputed issue unless the Supreme Court has agreed to review that issue prior to the date on which an appeal must be filed. Moreover, we read *Napoli* as establishing that a failure to raise a previously decided issue on appeal should not preclude subsequent collateral relief unless the Supreme Court agrees to review the issue prior to the resolution of the appeal to this court.

B. *Prejudice.*

As Peck stresses, there has been considerable litigation in which, on direct appeal, structuring convictions have been challenged on the basis of pre-*Ratzlaf* instructions. Generally, no objection was taken at trial (pre-*Ratzlaf*) to the instruction that is challenged on appeal (post-*Ratzlaf*), so the plain error standard of Fed.R.Crim.P. 52(b) governs. As the Supreme Court explained in *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), a conviction may be reversed for plain error only when there is "error" in the sense of deviation from an applicable legal rule, *id.* at 732–34, 113 S.Ct. at 1777; the error is "plain" in the sense that it is "clear" or "obvious," *id.;* the error "affec[ts] substantial rights" in the sense that "in most cases it ... must have been prejudicial: It must have affected the outcome of the district court proceedings," *id.*, 507 U.S. at 734, 113 S.Ct. at 1777–78; and the error " 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Id.* at 736, 113 S.Ct. at 1779 (quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)) (alteration in *Olano* ).

Applying plain error analysis, most of the decided cases have vacated the disputed structuring convictions. *See, e.g., United States v. Hove*, 52 F.3d 233, 235–36 (9th Cir.1995); *United States v. Garza*, 42 F.3d 251, 252–53 (5th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2263, 132 L.Ed.2d 268 (1995); *United States v. Bencs*, 28 F.3d 555, 564 (6th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 915, 130 L.Ed.2d 796 (1995); *United States v. Retos*, 25 F.3d 1220, 1228–32 (3d Cir.1994); *United States v. Jones*, 21 F.3d 165, 172–73 (7th Cir.1994); *United States v. Rogers*, 18 F.3d 265, 267–68 (4th Cir.1994). *United States v. Marder*, 48 F.3d 564, 571–75 (1st Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 1441, 131 L.Ed.2d 320 (1995), on the other hand, concluded that a faulty pre-*Ratzlaf* instruction did not constitute plain error. And in *United States v. Vazquez*, 53 F.3d 1216, 1223 (11th Cir.1995);

*United States v. Goulding*, 26 F.3d 656, 668–69 (7th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 673, 130 L.Ed.2d 605 (1994); and *United States v. Walker*, 25 F.3d 540, 548 (7th Cir.), *cert. denied*, —— U.S. ——, ——, 115 S.Ct. 371, 531, 130 L.Ed.2d 323, 434 (1994), pre-*Ratzlaf* instructions were nonetheless found to have satisfied *Ratzlaf*.[7]

■ In any event, plain error precedent does not squarely address the issue presented by this appeal. In *Frady*, the Supreme Court explicitly held that it is improper to determine a § 2255 appeal by the plain error standard, that the proper criterion for review is the "cause and actual prejudice" standard enunciated in prior Supreme Court decisions, and that accordingly, "to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." 456 U.S. at 166–67, 102 S.Ct. at 1593–94.

■ Thus, to determine whether an erroneous jury instruction resulted in actual prejudice, we must evaluate the error "in the total context of the events at trial" to ascertain "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 169, 102 S.Ct. at 1595 (internal quotations and citations omitted). Peck "must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 170, 102 S.Ct. at 1595.

In *Frady* itself, the omission of a subsequently mandated instruction concerning malice was not deemed to warrant habeas relief because "the strong uncontradicted evidence of malice in the record, coupled with Frady's utter failure to come forward with a colorable claim that he acted without malice, disposes of [Frady's] contention that he suffered such actual prejudice that reversal of his conviction ... could be justified." *Id.* at 172, 102 S.Ct. at 1596. The court also noted that a rational jury that concluded—as Frady's did—that Frady's crime was "deliberate and premeditated" could not have found an absence of malice. *Id.* at 174, 102 S.Ct. at 1597. The jury's findings thus supplied the missing element.

Similarly, in *Ianniello*, we denied § 2255 relief when the law was subsequently defined to require relatedness among predicate acts to sustain a RICO conviction, but "the evidence demonstrate[d] beyond a reasonable doubt the missing element in the jury instruction: the relatedness among Ianniello's predicate acts." 10 F.3d at 63. The *Ianniello* jury concluded that Ianniello had committed 44 predicate acts that we considered "densely related." *Id.* We accordingly held that "[n]o rational jury could have found that Ianniello committed this panoply of predicate acts without concluding that the acts were interrelated." *Id.*

■ *Frady* and *Ianniello* thus establish that a subsequent redefinition to add a new element to a crime will not result in "actual prejudice," despite a jury instruction that omitted reference to the new element, if it is clear that the jury's findings resolved in the government's favor the issue that would have been posed by a jury instruction that incorporated the new element. If this determination cannot be made, on the other hand, it is inappropriate to deny relief because, in the opinion of a reviewing court, the jury would have returned a conviction if it had considered the redefined crime at the time of trial. "The Sixth Amendment requires more than appellate speculation about a hypothetical jury's action, or else directed verdicts for the

---

7. *Walker* approved a definition of willfulness that is substantially similar to a key portion of the instruction employed in this case: "An act is done wilfully if done voluntarily and with [the] intention to do something the law forbids." 25 F.3d at 548 (emphasis deleted). The approval prompted a concurring opinion that was directed to "a possible ambiguity" in the quoted instruction, in that "the term '*willfully*' could be understood as either accepting the general intent to do something that happened to be illegal, or requir-

ing the specific intent to engage in conduct that the defendant knows to be unlawful," *id.* at 552 (Flaum, J., concurring), but concluded that in context, the willfulness instruction should be regarded as conveying the latter meaning. *Id.* at 553 (Flaum, J., concurring). In this case, Peck expressly sought, and the district court rejected, an instruction that complied with *Ratzlaf.* At least in these circumstances, there is no basis to regard the instruction that *was* given, even if arguably ambiguous, as satisfying *Ratzlaf.*

State would be sustainable on appeal; it requires an actual jury finding of guilt." *Sullivan v. Louisiana,* 508 U.S. 275, ——, 113 S.Ct. 2078, 2082, 124 L.Ed.2d 182 (1993).

We turn to the record presented on this appeal, which presents a close case for resolution of the "actual prejudice" issue. The jury rejected Peck's testimony that he believed that the bank reporting requirements applied to transactions of less than $10,000, and therefore thought that the banks were filing CTRs for all of the transactions supporting his indictment. They further rejected his claim that he did not intend to evade the CTR reporting requirements. This rejection was solidly grounded in a disbelief of Peck's testimony, which oscillated between the implausible and the preposterous.

For example, Peck's claim that he was repaying an entirely undocumented loan to his father, even though he repaid more than half of the loan before he received it, is hardly credible. Indeed, the contrary conclusion that Peck was attempting to hide his assets from the Internal Revenue Service is buttressed by his admission that he transferred his interest in his house to his wife and encumbered it with large mortgages to his father and sister in 1991 in part because of the indictment stemming from his failure to pay income taxes.

Even more implausible is his explanation that he made three very substantial cash deposits on November 7, 1991 by returning home to pick up cash and going to branches convenient to other errands. Peck's claim that he refused to make deposits or withdrawals when he knew that a CTR would be filed because he did not wish to wait is similarly unimpressive, in light of the time that he spent on so many days engaging in cash transactions at so many bank branches.

Peck's credibility was further tarnished by the evidence concerning the gross misstatements of income that Peck made on his tax returns, and by their enormous variance from the income he reported on a loan application and a bogus tax return that he submitted to a bank. In short, the record is clear that Peck lied to the government to avoid

paying the taxes that he owed, and engineered a complex scheme involving multiple structuring violations to hide his assets when his tax evasion was discovered. The jury could hardly have avoided concluding, on this record, that Peck knew about the CTR reporting requirements and undertook to structure cash transactions so as to evade them.

Further, the pivotal answer in Peck's testimony conjoined his denial that he structured the deposits with his denial that he knew that structuring was a crime. In answering the question whether he "intend[ed] to structure [his] banking transactions in order to evade the [CTR] requirements," Peck stated: "No, I had no idea that there was ever such a thing as structuring, *absolutely no awareness that there was a, such a criminal charge in my life* [emphasis added]."

■ The jury's evident and well founded disbelief of Peck's testimony, coupled with an imputed jury view that lawyers know all the law there is to know, led the district court to conclude that Peck had not made a case for § 2255 relief because "the result would [not] have been any different" if a *Ratzlaf* instruction had been given. Although the issue is close, we cannot affirm this ruling because it gives the right answer to the wrong question. The issue is not whether a jury presented with the *Ratzlaf* question would have convicted Peck, but rather whether the jury that tried him substantially answered the *Ratzlaf* question adversely to him in the course of its actual deliberations.

■ Unlike the determination in *Frady* and *Ianniello,* there is no necessary connection between the essential finding made in this case by the jury (that Peck knew about the CTR filing requirement and acted to evade it) and the essential finding required by *Ratzlaf* (Peck's knowledge that such evasion is a crime). Thus, because the *Ratzlaf* question was never put to the jury, and the jury made no finding from which an answer to the *Ratzlaf* question conclusively follows, we are left only with the conjecture that the jury surely would have answered the *Ratzlaf* question adversely to Peck if it *had* been put to them.[8]

---

8. We disagree with our dissenting colleague's    view that the majority opinion disregards the

We conclude that the instructional error at Peck's trial, unavoidable as it was in the light of governing Second Circuit precedent, nonetheless "worked to [Peck's] *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions," *Frady* 456 U.S. at 170, 102 S.Ct. at 1595, by depriving him of a jury ruling on an essential element of the crimes with which he was charged. His structuring convictions must therefore be reversed.

### Conclusion

Insofar as it failed to vacate Peck's structuring convictions, *see supra* note 1, the judgment of the district court is reversed.

WALKER, Circuit Judge, dissenting:

When Michael Peck requested the district court to instruct the jury that the government was required to prove that he knew that structuring his transactions to avoid the cash transaction reporting requirements was a crime, the district judge rejected the request in appropriate reliance on the then-existing law in this circuit. *See United States v. Caming*, 968 F.2d 232, 238–41 (2d Cir.), *cert. denied*, 506 U.S. 956, 113 S.Ct. 416, 121 L.Ed.2d 339 (1992). Peck did not appeal his conviction. Subsequently, in *Ratzlaf v. United States*, — U.S. —, —, 114 S.Ct. 655, 663, 126 L.Ed.2d 615 (1994), the Supreme Court held that the government must prove that the defendant knew that structuring was unlawful when he structured the transactions. Shortly thereafter, Peck filed a petition under 28 U.S.C. § 2255 requesting, among other things, that his conviction be vacated because the jury should have been given the *Ratzlaf*-type charge he had requested.

The district court rejected Peck's argument with respect to the erroneous instruc-

tion on the ground that there was no "fundamental unfairness." In reversing, the majority holds that Peck has demonstrated both cause for his failure to raise the issue on direct appeal and actual prejudice arising therefrom. Because I believe that the district court was correct and that Peck has failed to satisfy the test of *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), I respectfully dissent.

In *Brecht*, the Supreme Court held that in collateral proceedings the test for whether a "trial error" is sufficient to warrant reversal is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" 507 U.S. at 637, 113 S.Ct. at 1722 (quoting *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). In so doing, the Court rejected for collateral review, the standard of "harmless beyond a reasonable doubt" announced in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) for direct review of constitutional error. The inquiry is therefore two-fold: first, whether the failure to give the *Ratzlaf* instruction was a "trial error"; second, if it was, whether the error "'substantially influenced the jury's decision,'" *O'Neal v. McAninch*, — U.S. —, —, 115 S.Ct. 992, 995, 130 L.Ed.2d 947 (1995).

### A. Trial Error

I have no difficulty concluding that the error by the district court, viewed in hindsight from the perspective of *Ratzlaf*, was trial error. The Supreme Court has found, in most cases, that even constitutionally-deficient jury instructions are "trial errors," not "structural errors," and thus are subject to harmless error analysis. *See United States v. Gaudin*, — U.S. —, —, 115 S.Ct.

harmless error standard established by *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). *Brecht* decided that when an issue of "trial error" is presented by a habeas petition, the proper test is whether the error "'had substantial and injurious effect or influence in determining the jury's verdict,'" *id.* at 623, 113 S.Ct. at 1714 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)), rather than whether the error "'was harmless beyond a reasonable

doubt,'" *id.* at 622, 113 S.Ct. at 1713 (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)). We take no issue with this rule. *Indeed,* the dissent views the *Brecht* inquiry as properly "equate[d] to the 'actual prejudice' test under *Frady*," and we follow *Frady*. In sum, our difference with Judge Walker concerning the appropriate disposition of this appeal does not implicate any overt or covert disregard on our part of the Supreme Court's teaching in *Brecht*.

2310, 2321, 132 L.Ed.2d 444 (1995) (Rehnquist, C.J., concurring) (citing cases). For example, the Court has applied harmless error analysis in cases where the trial court incorrectly charged the jury that it could determine obscenity with reference to state-wide standards rather than to a reasonable person standard, *Pope v. Illinois,* 481 U.S. 497, 502–04, 107 S.Ct. 1918, 1921–23, 95 L.Ed.2d 439 (1987), where an unconstitutional burden-shifting jury instruction was given, *Yates v. Evatt,* 500 U.S. 391, 402, 111 S.Ct. 1884, 1892, 114 L.Ed.2d 432 (1991), and where erroneous presumption instructions were given, *Carella v. California,* 491 U.S. 263, 266, 109 S.Ct. 2419, 2421, 105 L.Ed.2d 218 (1989) (per curiam); *Rose v. Clark,* 478 U.S. 570, 579–80, 106 S.Ct. 3101, 3106–07, 92 L.Ed.2d 460 (1986). The Court has carved out a single exception: where the trial court fails to give a proper "reasonable doubt" instruction, the error requires automatic reversal. *See Sullivan v. Louisiana,* 508 U.S. 275, ——, 113 S.Ct. 2078, 2082, 124 L.Ed.2d 182 (1993).

I believe that the proper question for us, then, is whether the failure to give a *Ratzlaf* instruction is consistent with the numerous cases of faulty instructions in which harmless error review has been applied, or the singular situation, *per se* not harmless, in which the trial court gives an improper reasonable doubt instruction. The caselaw of the Supreme Court and of this circuit leads me to the conclusion that the error in this case falls within the former category and thus is amenable to harmless error analysis.

In *Sullivan,* Justice Scalia, writing for the Court, distinguished a failure to give a reasonable doubt instruction from other errors. He reasoned that when the reasonable doubt instruction is flawed, "the question whether the *same* verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless. There is no *object,* so to speak, upon which harmless-error scrutiny can operate." 508 U.S. at ——, 113 S.Ct. at 2082. That logic, though, is irrelevant in this case. Unlike the situation in *Sullivan,* Peck was convicted by a jury of his crime beyond a reasonable doubt, and therefore, we are not prevented from concluding, if the evidence so warrants, "that the jury's actual finding of guilty beyond a reasonable doubt *would surely not have been different* absent the constitutional error." *Id.*

In this circuit, we have applied harmless error analysis to an erroneous jury instruction on collateral review. In *Ianniello v. United States,* 10 F.3d 59, 63–64 (2d Cir. 1993), we concluded that a failure to give a proper RICO pattern charge was not subject to automatic reversal, and we affirmed "because the evidence demonstrate[d] beyond a reasonable doubt the missing element in the jury instruction." In my view, harmless error analysis applies to the erroneous *Ratzlaf* charge no less than to the improper RICO pattern charge in *Ianniello. See also United States v. Parmelee,* 42 F.3d 387 (7th Cir. 1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 63, 133 L.Ed.2d 25 (1995); *People v. Avila,* 35 Cal.App.4th 642, 43 Cal.Rptr.2d 853 (1995).

### B. Harmless Error Under § 2255.

The remaining question is whether the failure to give the *Ratzlaf* instruction was harmless, an inquiry that I equate to the "actual prejudice" test under *United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). As the First Circuit has noted, there is confusion in the caselaw over the proper standard to apply: 1) whether the jury must have made findings so nearly equivalent to the missing finding that the error is harmless, or 2) whether the evidence presented at trial established the missing element beyond a reasonable doubt. *See United States v. Marder,* 48 F.3d 564, 573 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 1441, 131 L.Ed.2d 320 (1995). While the majority appears to adopt the first approach in this case, see *supra* at 1227, I believe that, at least in the context of collateral review, the second is more consistent with the precedents of the Supreme Court and of this circuit.

Under the test the majority uses, the failure to give a proper instruction must always result in a reversal unless "it is clear that the jury's findings resolved in the government's favor the issue that would have been posed

by a jury instruction that incorporated the new element." See *supra* at 1227. The effect of this standard will be to ensure that in almost every case in which the trial court fails to properly instruct on an element of an offense, a reversal of the conviction will be required. Only in the few cases where the jury's findings on other issues would necessitate a conclusion in the government's favor on the missing element will the error be found to be harmless.[1]

The sources cited by the majority do not support its narrow view. *Sullivan*, as I noted above, was not a harmless error case at all, but rather a case in which the Supreme Court found a reasonable doubt instruction to be a structural error, requiring automatic reversal. In *Frady*, the Court held that the failure to give a proper malice instruction was not prejudicial because "the strong uncontradicted evidence of malice in the record, coupled with Frady's utter failure to come forward with a colorable claim that he acted without malice, disposes of his contention that he suffered actual prejudice." 456 U.S. at 172, 102 S.Ct. at 1596. Far from supporting the majority's rule, *Frady* illustrates the Supreme Court's directive that, in connection with a § 2255 petition, we must examine the actual evidence at trial to see if a harmless error occurred.

Finally, the majority's citation to *Ianniello* does not aid its conclusion. To be sure, we said there that courts may uphold a jury verdict despite an erroneous charge where the "facts found by a jury are so conclusive on an ultimate factual issue ... that the error in the charge and resultant absence of an actual jury finding on the ultimate issue are harmless." 10 F.3d at 64. However, we went further. We stated that "a conviction should be affirmed where a reviewing court can find that the record at trial established guilt beyond a reasonable doubt and where no rational jury could conclude otherwise." *Id.* at 65 (internal citations and quotations omitted) (citing *Pope*, 481 U.S. at 501–04, 107 S.Ct. at 1921–23).

The better view, I believe, is that we may affirm a conviction despite an erroneous *Ratzlaf* instruction where we are convinced that a properly instructed and rational jury, after hearing all the evidence, would necessarily have found the defendant guilty beyond a reasonable doubt. This view is supported not only by the foregoing cases, but also by the decisions of other courts. For example, in *United States v. Parmelee*, 42 F.3d 387 (7th Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 63, 133 L.Ed.2d 25 (1995), the Seventh Circuit affirmed the defendants' convictions despite an erroneous mens rea instruction. The defendants had been convicted of conspiring to transport illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(B), *inter alia.* The Seventh Circuit held that a conviction under § 1324(a)(1)(B) required not only knowledge by the defendant that the alien had entered the United States illegally, but also that the defendant knowingly transported the alien to further the alien's violation. Despite the trial court's failure to give the proper instruction, the Seventh Circuit affirmed. The court reasoned that a rational jury, having found that the defendants knew that the aliens were illegal, necessarily would have found that the defendants knew that they were furthering the aliens' violation of the law. *Id.* at 393. Significantly, the court noted that, while a jury conceivably could have reached a different result, a jury could not have done so rationally given the jury's actual findings and the unrebutted mens rea evidence. *Id.; see also Avila,* 43 Cal.Rptr.2d at 866–67.

Moreover, because this case involves a § 2255 petition we should be even more cautious in granting relief than the *Parmelee* court, which was directly reviewing a conviction. A common theme of the Supreme Court's decisions has been that collateral relief is available only for those who have been "'grievously wronged.'" *Brecht,* 507 U.S. at 637, 113 S.Ct. at 1721. Thus, "'an error that may justify reversal on direct appeal will not

---

1. Indeed, in a case where the jury is required to find the missing element in reaching a guilty verdict under the charge that was given, there may not even be a constitutional violation. *See Avila,* 43 Cal.Rptr.2d at 860 (citing *Victor v.* *Nebraska,* —— U.S. ——, ————, 114 S.Ct. 1239, 1250–51, 127 L.Ed.2d 583 (1994); *Estelle v. McGuire,* 502 U.S. 62, 74, 112 S.Ct. 475, 483, 116 L.Ed.2d 385 (1991)). However, resolution of that issue is not required in this case.

necessarily support a collateral attack on a final judgment. The reasons for narrowly limiting the grounds for collateral attack on final judgments are well known and basic to our adversary system of justice.'" *Frady,* 456 U.S. at 165, 102 S.Ct. at 1593 (quoting *United States v. Addonizio,* 442 U.S. 178, 184, 99 S.Ct. 2235, 2239, 60 L.Ed.2d 805 (1979)). The majority's approach, however, will grant relief to all petitioners on collateral review who can show that their jury was not properly instructed on the intent element in a structuring prosecution. But to grant habeas corpus relief to anyone who demonstrates that the trial judge did not give a *Ratzlaf* instruction, even if one is quite sure that the petitioner would have been convicted had the proper instruction been given, ignores *Brecht*'s command that relief be limited to those "grievously wronged." I believe that *Brecht* requires us to discriminate among those petitioners who have shown a failure by the district court to give a proper *Ratzlaf* instruction and to grant relief only where, based on all the evidence at trial, we are not convinced that a rational jury would have convicted the petitioner if they had received a proper instruction.

Applying these principles, Peck cannot prevail. The evidence the government presented against Peck was overwhelming and would have been viewed that way by a properly charged, reasonable jury. The government demonstrated that Peck had engaged in repeated cash transactions, often on consecutive days, which were all below the $10,000 reporting limits for Currency Transaction Reports ("CTRs"), and which cumulatively would have exceeded the limits. For instance, the evidence at trial showed that Peck opened a new checking account at Northeast Savings Bank on Friday, March 27, 1992. The following Monday, March 30, he withdrew $6500 in cash. On each of the next two days, he withdrew $6000 in cash. The day after that, April 2nd, he withdrew $6500 in cash. Then, on Friday, April 3rd, he tried to take out $6000 more, but was unable to do so and instead withdrew $7000 from each of two accounts at other banks. The following Monday, April 6th, Peck attempted to withdraw $5000 from an account at the Bank of Boston, but upon being in-

formed that a CTR would have to be filed by the bank, he left and instead withdrew $5000 from an account at the Society for Savings. These transactions, over six consecutive business days, totaled $44,000 in actual withdrawals, through seven different transactions, none of which triggered the CTR reporting requirements.

Of course, the issue is not whether Peck knew about the reporting obligations and intended to evade them, but whether he knew that structuring the transactions was a crime. *See Ratzlaf,* —— U.S. at ——, 114 S.Ct. at 663. However, as the Supreme Court pointed out, a jury may "find the requisite knowledge on defendant's part by drawing reasonable inferences from the evidence of defendant's conduct." *Id.* at —— n. 19, 114 S.Ct. at 663 n. 19. Thus, the government was not required to present direct evidence that the Peck knew about the requirement; it could, and in my view did, meet its burden by providing circumstantial evidence that Peck had to have known that what he was doing was illegal. *See United States v. Hurley,* 63 F.3d 1, 15–16 (1st Cir. 1995); *United States v. Tipton,* 56 F.3d 1009, 1012 (9th Cir.1995); *Marder,* 48 F.3d at 574; *see United States v. Walker,* 25 F.3d 540, 548 n. 8 (7th Cir.), *cert. denied,* —— U.S. ——, ——, 115 S.Ct. 371, 531, 130 L.Ed.2d 323, 434 (1994). *But see United States v. Wynn,* 61 F.3d 921, 927–28 (D.C.Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 578, 133 L.Ed.2d 501 (1995); *United States v. Vazquez,* 53 F.3d 1216, 1225 (11th Cir.1995). In addition to the "intricate and odd structuring of transactions," *Walker,* 25 F.3d at 548 n. 8, so as to avoid the reporting requirements and the evidence that Peck refused to withdraw money when told it would trigger the CTR requirements, the government offered the testimony of one bank teller that she had explained the CTR rules to Peck in 1990. Moreover, Peck himself was a lawyer.

Peck's only evidence in defense seems to have been his own testimony, to which the jury gave no credence. As the majority notes, Peck's own testimony at trial "oscillated between the implausible and the preposterous." *Supra* at 1228. Peck denied knowledge of the criminality of structuring in one

place only: in the very same sentence in which he claimed, falsely in the eyes of the jury or they would not have convicted him, that he had not structured his transactions to avoid the CTR requirements. The jury was perfectly free to add its disbelief of Peck's testimony to the considerable proof of Peck's mens rea produced by the government. *See, e.g., United States v. Aulicino,* 44 F.3d 1102, 1114 (2d Cir.1995) ("The defendant's testimony may thus add weight to the government's case."); *United States v. Stanley,* 928 F.2d 575, 577 (2d Cir.) ("[T]he jury [is] entitled to disbelieve [the defendant's] testimony, and use its disbelief to supplement the other evidence against him."), *cert. denied,* 502 U.S. 845, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991). There is no reason to believe that the jury credited his denial of knowledge that structuring was a crime any more than his self-serving statement that he was not intentionally trying to evade the CTR requirements, which by its verdict the jury rejected.

Presented with the evidence that Peck knew of the reporting requirements, that he acted purposefully to evade those requirements, and that he was attorney, and having necessarily rejected his flat denial of any knowledge of any of the legal requirements, I can only conclude that the jury, had it been properly charged, would still have found Peck guilty.

The standard of review used by the majority today is, in my view, inappropriate for habeas corpus review after the Supreme Court's decision in *Brecht.* The Court there bottomed its application of the *Kotteakos* standard, and rejection of the *Chapman* standard, for reviewing constitutional trial error on collateral review upon the notion that "the writ of habeas corpus has historically been regarded as an extraordinary remedy, a bulwark against convictions that violate 'fundamental fairness.'" 507 U.S. at 629, 113 S.Ct. at 1719 (citations omitted). By effectively applying the *Chapman* standard in this case, the majority implicitly dispenses with the important distinction between direct and collateral review with which six justices agreed in *Brecht,* and instead follows the dissent in that case. Because I conclude that no actual prejudice has been shown and that the judgment of the district court dismissing the § 2255 petition should be affirmed, I respectfully dissent.